[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-14632
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2012
JOHN LEY
CLERK

D.C. Docket No. 4:08-cr-00315-WTM-GRS-45

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTONIO DAWON WOODLEY,
a.k.a. Crazy,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 18, 2012)

Before TJOFLAT and HULL, Circuit Judges, and HUCK,* District Judge.

PER CURIAM:

Defendant Antonio Dawon Woodley appeals his convictions and 210-month

_____

*The Honorable Paul C. Huck, United States District Judge for the Southern District of
Florida, sitting by designation.

total sentence for conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841 and 846, and for unlawful use of a telephone to facilitate a felony drug-distribution conspiracy, in violation of 21 U.S.C. § 843(b). After review and oral argument, we affirm.

## I. BACKGROUND

### A. Indictment and Pre-Trial Proceedings

On November 10, 2008, Woodley was indicted under three counts of a 166-count indictment relating to a drug-distribution conspiracy. The three counts were: conspiracy to distribute 5 kilograms or more of cocaine, 50 grams or more of crack cocaine, and 50 kilograms or more of marijuana, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a) and (b), and 846 (Count 1); and unlawful use of a telephone to facilitate a felony drug-distribution conspiracy, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 843(b) (Counts 44 and 66). Forty-four other co-defendants were indicted, all of whom pled guilty except for Javier Valdivia, who never made an appearance.

On March 30, 2009, Woodley was arrested and, that same day, made his initial appearance before the district court. In the months preceding his jury trial, Woodley filed over forty pre-trial motions and pleadings. One of the motions, filed April 29, 2009, was for a mental evaluation, which the magistrate judge

granted. Following the evaluation, the magistrate judge recommended that Woodley was competent to stand trial. Woodley did not challenge that recommendation.

In addition, Woodley's appointed counsel moved to withdraw in April 2009 and again in December 2009. Woodley himself, despite having appointed counsel, filed a pro se "waiver of counsel" in October 2009 and December 2009. After a hearing on January 25, 2010, the magistrate judge permitted Woodley to proceed pro se, following Woodley's insistence on self-representation despite warnings from the magistrate judge.

On February 19, 2010, Woodley filed a "Motion for Speedy Trial." Then, on April 5, 2010, Woodley made a demand for a jury trial "at the fastest and earliest date possible." On April 7, 2010, the district court dismissed the speedy trial motion as moot, stating that the court was "aware of the Defendant's rights under the Speedy Trial Act" and would bring Woodley "to trial in an expeditious manner." The record reveals no activity in Woodley's case for the four-month period from April 7, 2010, to August 5, 2010.

On August 11, 2010, Woodley moved to dismiss his case under the Speedy Trial Act. The district court denied the motion on August 16, 2010, and set the case for trial on September 27, 2010. Woodley was the only co-defendant to go to

trial on the charges.

**B.      Woodley's September 2010 Trial**

On September 27, 2010, Woodley's trial commenced as planned. One of

the main figures in the conspiracy, co-defendant Telly Petty, testified at

Woodley's trial. Petty was a major distributor of powder cocaine in Savannah,

Georgia, and had between 40 and 50 customers. Petty obtained the cocaine

through couriers, who took his money to Atlanta, bought the cocaine, and brought

it back to Savannah. Typically, Petty followed the couriers in a separate car.

After meeting Woodley in late 2007, Petty began to sell cocaine to him in

Savannah. Petty testified that he supplied Woodley with cocaine "more than five,

but maybe less than ten" times, in amounts of either four-and-a-half or nine

ounces. Petty charged around $5,000 or $6,500 for nine ounces during the time he

was selling cocaine to Woodley. According to Petty, Woodley bought the cocaine

for resale, not personal use, and paid cash on delivery.

Generally, Petty and Woodley spoke on the telephone before each cocaine

transaction. Agents from the U.S. Drug Enforcement Administration obtained

authorization to wiretap these conversations, and five recordings were played for

the jury without objection. The first recorded call was on April 7, 2008. Petty

identified Woodley and himself on the recording and explained that Woodley was

4

trying to buy drugs. During the call, Petty stated he wanted to get "trees" from a source Woodley knew. When expressly asked what "trees" referred to, Petty testified it meant "buying a little bit of marijuana." In the second recorded call, which took place approximately 45 minutes later, Woodley called Petty to report his source had "got off the last zoner." Petty testified that meant the marijuana had been sold.

In the third recorded conversation on April 16, 2008, Woodley told Petty he had seven "chips" to give him. Petty testified "chips" meant money, and Woodley was to give him $7,000 in exchange for about nine ounces of cocaine. Petty replied that he was unsure when "it's going to be" because "it's been about 5 days right now," but would call when he heard from his source. Petty testified his response meant he was having difficulty obtaining the cocaine. This April 16, 2008, call formed the basis of Count 44.

A few days later, on April 19, 2008, Petty attempted to travel to Atlanta to procure cocaine from a co-defendant. Petty followed his courier, co-defendant Donna Thompson, who was carrying $87,000 of Petty's money. However, before reaching Atlanta, Thompson was pulled over by police.

In the fourth recorded conversation on April 20, 2008, Petty called Woodley to explain what happened. Petty stated that he was having difficulty securing

drugs because Thompson was pulled over with the money. In response, Woodley said he had "a little something, about five for you if you need it." Petty testified that meant Woodley offered a $5,000 advance on his next purchase, even though normally, the purchases were "cash on delivery."

A final recording on April 22, 2008, was a call from Woodley to Petty inquiring about Thompson. Woodley asked what level of law enforcement had pulled Thompson over and what citation was issued. Petty replied that it was the county sheriff's office and asked Woodley to meet him in person. Petty testified the two men met shortly thereafter and discussed both the seizure of money from Thompson and Petty's ability to sell Woodley more cocaine. This April 22, 2008, call formed the basis of Count 66.

Petty stopped selling cocaine to Woodley around June 2008. When the government asked Petty why the sales stopped, Petty answered that his cousin said Woodley had robbed him.[1] Woodley did not object to this testimony. However,

---

[1]The exchange was as follows:
Q: And why did you stop dealing with Mr. Woodley?
A: Well, one of my cousins told me something about him and Mr. Woodley had some kind of confrontation, which Woodley robbed him or something like that. So I just -- I kind of stayed away from him because he was already doing wrong. I ain't wanting no violence to be involved so I just stayed away from him.
Q: Did your cousin tell you that he had been robbed by Mr. Woodley?
A: Yeah, he called me and told me that one morning.

when this cousin, Keith Futch, later testified, Woodley brought up the robbery on cross-examination. Futch stated that he had not been robbed by Woodley, but by someone Woodley knew.

The government also introduced Woodley's prior conviction for trafficking cocaine.

After the government rested, Woodley did not testify, but he did call Petty and another witness. At the conclusion of all the evidence, Woodley moved for judgment of acquittal on all three counts based on insufficiency of the evidence. The district court denied the motion. The court then instructed the jury and included an instruction that the jury could not consider "evidence of acts done by the defendant on other occasions" in determining "whether the defendant committed the acts charged now."

The jury found Woodley guilty on all three counts (Counts 1, 44, and 66). As to Count 1, the verdict form asked the jury, if it found Woodley guilty, to check a box indicating its finding as to the amount of pure cocaine, crack cocaine, and/or marijuana involved. The jury checked only one box under pure cocaine, indicating the offense involved "less than 500 grams," and thus no crack cocaine or marijuana.

C.    **Presentence Investigation Report and Sentencing**

The Presentence Investigation Report ("PSI") determined Woodley's base offense level was 26 because the offense involved between 500 grams and 2 kilograms of cocaine. See U.S.S.G. §§ 2D1.1(c)(7), 2D1.6. The PSI classified Woodley as a career offender, pursuant to U.S.S.G. § 4B1.1, based on his prior convictions for felony obstruction of an officer and possession of a controlled substance with intent to distribute. The career-offender classification increased Woodley's total offense level to 32 and his criminal history category to VI, resulting in an advisory guidelines range of 210 to 262 months' imprisonment.

At his January 21, 2011, sentencing, Woodley objected, inter alia, to the PSI's determination of the amount of cocaine involved in the offense because the jury determined it involved less than 500 grams. The district court overruled Woodley's objection and adopted the factual statements set forth in the PSI. The district court stated that it had reviewed the trial testimony, the recordings in evidence, the PSI, and the § 3553(a) factors. The court then imposed a sentence of 210 months for Count 1 and 48 months for both Counts 44 and 66, to run concurrently. In response to the district court's inquiry whether there were any objections, Woodley stated, "Still the same objections."

## II. SPEEDY TRIAL ACT

Woodley first argues that the four-month delay from April 2010 to August

8

2010 violated the Speedy Trial Act, 18 U.S.C. § 3161.  The government agrees there was a four-month delay, but contends it was excludable because co-defendant Javier Valdivia was a fugitive.  We review a claim under the Speedy Trial Act de novo and the district court's factual determinations on excludable time for clear error.  United States v. Williams, 314 F.3d 552, 556 (11th Cir. 2002).  Under clear-error review, we affirm a district court's determination so long as it is plausible in light of the record.  United States v. Ladson, 643 F.3d 1335, 1341 (11th Cir. 2011).

## A.    Legal Framework

The Speedy Trial Act generally requires that a criminal trial begin within seventy days of a defendant's indictment, information, or appearance, whichever is later.  18 U.S.C. § 3161(c)(1).  A defendant may seek the dismissal of the indictment on the ground that the Act was violated.  Id. § 3162(a)(2).  If the district court determines the Speedy Trial Act was violated, the court must dismiss the case, either with or without prejudice.  Id.

The Speedy Trial Act excludes, however, certain periods of delay from the time within which the trial must begin.  See id. § 3161(h).  Two of these exclusions are relevant in this case.  First, § 3161(h)(3) excludes "[a]ny period of delay resulting from the absence or unavailability of the defendant."  Id.

9

§ 3161(h)(3)(A).[2] Second, § 3161(h)(6) excludes "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." Id. § 3161(h)(6). Section 3161(h)(6) embodies the principle that "a delay caused by one defendant is generally excludable as to his codefendants." United States v. Tobin, 840 F.2d 867, 869 (11th Cir. 1988). Thus, if the speedy trial clock for a co-defendant is not running because the co-defendant is at large and therefore "absent" within the meaning of § 3161(h)(3), the speedy trial clock for the defendant himself, under § 3161(h)(6), generally stops running as well. Id. As this Court has observed, § 3161(h)(6) evidences a "strong judicial and legislative policy favoring joint trials," particularly in "major narcotics conspiracies" like the case before us. United States v. Davenport, 935 F.2d 1223, 1236 (11th Cir. 1991).

Nonetheless, this policy does not mean that all of the time during which a co-defendant remains at large may properly be attributed to another defendant. Under the express words of the Act, exclusion under § 3161(h)(6) is "limited to 'a reasonable period of delay.'" Davenport, 935 F.2d at 1228 (quoting 18 U.S.C.

---

[2] A defendant is "absent" if "his whereabouts are unknown and, in addition, he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence." 18 U.S.C. § 3161(h)(3)(B).

§ 3161(h)(6)) (emphasis added).[3] Whether the delay attributed to the defendant Woodley under § 3161(h)(6) is reasonable is determined by reference to (1) the totality of the circumstances prior to trial, (2) whether the delay caused actual prejudice to the defendant Woodley, or (3) the sheer length of the delay. Id. at 1236. Under the totality of the circumstances approach, this Court considers the purpose of the delay to determine whether the delay was excessive. Tobin, 840 F.2d at 870 (concluding a delay of eight months and ten days was necessary for an unsuccessful attempt to apprehend a co-defendant and achieve a joint trial). Under the actual prejudice approach, this Court considers whether, inter alia, the delay impaired the defense. Davenport, 935 F.2d at 1237 (concluding there was no evidence that a delay of six months prejudiced the defendant-appellant's defense).

Two decisions of this Court, United States v. Tobin, 840 F.2d 867, and United States v. Davenport, 935 F.2d 1223, illustrate how these Speedy Trial Act principles apply. In Tobin, the defendant was not brought to trial until eight months and ten days after being indicted. 840 F.2d at 869. His co-defendant remained a fugitive throughout this period. Id. at 868. Prior to trial, the defendant moved to dismiss the indictment because of an alleged Speedy Trial Act violation.

---

[3]At the time this Court decided Davenport, the provision was codified at § 3161(h)(7), and this Court therefore referred to that section. 935 F.2d at 1228. In 2008, that provision was redesignated as § 3161(h)(6). See Judicial Administration and Technical Amendments Act of 2008, Pub L. No. 110-406, § 13, 122 Stat. 4291, 4294.

11

Id. The district court denied the motion. On appeal, the defendant argued that his Speedy Trial Act right was violated because of the delay between his indictment and trial, and that any delay attributed to his co-defendant was not excludable. Id. at 868-69.

This Court in Tobin concluded that the delay attributable to the fugitive co-defendant was reasonable and therefore excludable under the Speedy Trial Act as to the defendant. Id. at 869-70. Under the totality of the circumstances approach, this Court reasoned that the government had attempted, if unsuccessfully, to achieve a joint trial, a "necessary" delay. Id. at 870. This Court also determined under the actual prejudice approach that the defendant had not alleged any "substantial" prejudice from the delay. Id. Further, this Court observed that the defendant had never moved to sever his case. Id.

In Davenport, the defendant and multiple co-defendants were indicted under counts related to a marijuana importation-and-distribution scheme. 935 F.2d at 1226. The defendant argued on appeal that his Speedy Trial Act right was violated because of a six-month delay resulting from his co-defendants' motions for a continuance, among other reasons. Id. at 1236. The district court granted the continuance to allow the co-defendants time to obtain counsel and prepare a defense. Id. The defendant conceded that the delay as to his co-defendants may

have been necessary, but argued it was unreasonable as to him.  Id.

The Davenport Court rejected this argument and determined the delay was reasonable with respect to the defendant.  Id. at 1238.  After noting "the strong judicial and legislative policy favoring joint trials," this Court stated that under the circumstances of the multi-defendant case, the delay caused by an effort to ensure the co-defendants were able to present a defense was reasonable.  Id. at 1236-37.  Moreover, this Court concluded that there was "very little prejudice" resulting from the delay, and that the length of the delay was reasonable considering most of the continuance period alternatively would have been excluded due to various other motions filed by the defendant and his co-defendants.  Id. at 1237.

## B.    The Reasonableness of the Four-Month Delay

Woodley marshals several arguments for why the four-month delay here was not reasonable.[4]  According to Woodley, the district court failed to apply "the reasonable test required in the statute."  The Speedy Trial Act, however, provides no test for determining reasonableness, but rather imposes only a bare-bones

---

[4]At oral argument, Woodley's counsel raised the possibility that the delay could also extend back to the time of his indictment.  This argument was not raised in Woodley's briefs, so we need not address it.  Nonetheless, we note that much of the time post-indictment would be excludable anyway due to, among other things, Woodley's extensive motion practice.  See 18 U.S.C. § 3161(h)(1)(D); Davenport, 935 F.2d at 1237 (concluding that much of the delay at issue would have been excluded due to motions filed by the defendant and his co-defendants).  Indeed, while the motions were pending, it would have been futile for the district court to have set the case for trial.  Thus, we look to the four-month period after the motions were concluded.

13

requirement that the delay be "reasonable." In any event, the district court clearly and properly considered whether the delay was reasonable. The district court quoted § 3161(h)(6), acknowledged that the statute permitted exclusion of "[a] reasonable period of delay," and cited both Tobin and Davenport, two of our most relevant precedents, before finding the four-month delay was reasonable because co-defendant Valdivia was a fugitive during the period.

Woodley argues that, under the totality of the circumstances, the delay was unreasonable under United States v. Khoury, 901 F.2d 948 (11th Cir. 1990), because the government in his case did not affirmatively come forward and show diligence in apprehending co-defendant Valdivia. In Khoury, this Court held that the Speedy Trial Act was not violated because of various periods of excludable delay. Id. at 974. Before reaching that holding, however, this Court concluded that a ten-month delay attributed to a fugitive co-defendant was unreasonable because the defendant had moved to sever during that period and the government in response had failed to show both diligence in apprehending the fugitive co-defendant and a good faith belief that apprehension would occur promptly. Id. at 973. But because another co-defendant's motion to suppress evidence was pending throughout the period, this Court concluded that the overall delay did not violate the Act. Id. at 974.

14

Thus, Khoury's analysis applies only if the defendant first requested severance. Woodley did not. When no motion to sever has been granted, let alone made, any delay occasioned by the unavailable co-defendant under § 3161(h)(3)(A) is properly charged to the defendant under § 3161(h)(6). Davenport, 935 F.2d at 1229-30. The four-month delay here was occasioned by the government's efforts to locate a fugitive co-defendant and to avoid multiple trials in a major narcotics conspiracy case. This Court, under similar circumstances in Tobin, concluded that a longer delay of eight months was reasonable. 840 F.2d at 870. Likewise, we conclude under these total circumstances here the district court did not err in determining the delay was reasonable.[5]

Woodley also argues that he suffered actual prejudice because he was incarcerated and could not access a law library or interview witnesses. As to any alleged prejudice due to incarceration, Woodley presents only his bare contention that his conditions of confinement were "unfit and unsanitary." That assertion alone is insufficient to render the four-month delay unreasonable. See United

---

[5]We also reject Woodley's argument that because the district court ultimately held the trial without Woodley's fugitive co-defendant, that fact alone means the court thereby constructively construed Woodley's motions to include a motion to sever. We are unconvinced. Woodley's brief on appeal acknowledges his failure to move to sever, stating, "Mr. Woodley's failure to file a motion for severance does not excuse the unreasonable period of delay." In any event, Woodley's motion for a speedy trial and demand for a jury trial do not reference, much less request, severance.

States v. Darby, 744 F.2d 1508, 1519 (11th Cir. 1984) (concluding defendant's argument that he suffered prejudice due to "prolonged pretrial incarceration" did not establish unreasonableness of forty-two-day delay); see also United States v. Franklin, 148 F.3d 451, 458 (5th Cir. 1998) (concluding no prejudice was shown where defendant never moved to sever and relied exclusively on the length of his pre-trial detention to establish prejudice).

As for the alleged difficulty Woodley experienced accessing a library or interviewing witnesses, that was simply a reality of his incarceration, no matter the length of the delay. Of his own accord, Woodley dismissed counsel and chose to proceed pro se, despite the magistrate judge's warning. See Edwards v. United States, 795 F.2d 958, 961 n.3 (11th Cir. 1986) (concluding that an inmate's decision to dismiss counsel and proceed pro se at trial precluded his later § 2255 claim that he did not have access to a law library). Further, Woodley offers no explanation of any actual impairment caused by the delay, such as evidence lost or witnesses who became unavailable. Thus, we conclude the four-month delay attributable to the government's efforts to apprehend Woodley's fugitive co-defendant was reasonable. The district court did not err in denying Woodley's motion to dismiss the indictment based on the Speedy Trial Act.

### III.  SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL

Woodley argues that the 22-month delay between his indictment and trial violated his Sixth Amendment right to a speedy trial. Because Woodley raises this claim for the first time on appeal, we review only for plain error. See United States v. McDaniel, 631 F.3d 1204, 1209 n.2 (11th Cir. 2011) (applying plain-error review to speedy-trial argument not raised in the district court). To establish plain error, a defendant must show (1) there was an error (2) that was plain or obvious and (3) that affected his substantial rights. United States v. Davila, 664 F.3d 1355, 1358 (11th Cir. 2011). If the defendant meets that showing, this Court then has discretion to correct an error that seriously affected the fairness, integrity, or public reputation of the proceeding. United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. Amend. VI. In reviewing a Sixth Amendment claim, this Court employs the four-factor Barker v. Wingo balancing test. Davenport, 935 F.2d at 1239 (citing Barker, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972)). The non-exclusive factors to be considered are: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial, if any; and (4) any prejudice suffered by the defendant. Id. If the first three factors weigh heavily against the government, the

defendant need not demonstrate any actual prejudice. United States v. Dunn, 345 F.3d 1285, 1296 (11th Cir. 2003).

Woodley asserts, and the government does not appear to contest, that the first and third factors are met. Thus, we assume arguendo that both factors weigh heavily against the government, and analyze only the second and fourth factors.

As to the second factor, we conclude the government has met its burden of explaining the reasons for the delay. See United States v. Villarreal, 613 F.3d 1344, 1351 (11th Cir. 2010). First, the majority of the 22-month delay was attributable to Woodley. Woodley was indicted on November 10, 2008, but not arrested until March 31, 2009. Beginning on April 7, 2009, until April 5, 2010, Woodley filed over forty pre-trial motions, and the district court conducted multiple pre-trial hearings and proceedings. This period does not count against the government. See United States v. Schlei, 122 F.3d 944, 987 (11th Cir. 1997) (holding that a delay caused by "well over 100 pretrial motions" filed by the defendant and his co-defendants was reasonable).

The only two periods when no pre-trial motions were pending were (1) between Woodley's indictment and arrest, and (2) between April 7, 2010, and August 5, 2010. As to the first period, the record is silent on whether Woodley evaded arrest, and whether the government was diligent in its efforts to apprehend

18

him. Without more, the cause of this delay is, at worst, analogous to the neutral reasons for delay discussed in Barker, such as negligence or overcrowded court dockets. Barker, 407 U.S. at 531, 92 S. Ct. at 2192. The second period of delay was justified by the government's attempt to find the fugitive co-defendant Valdivia, and there is no evidence of bad faith by the government in doing so. See Davenport, 935 F.2d at 1239-40 (explaining that although the government was responsible for the delay, the delay was "inherent to the government's good faith effort to conduct a complex, joint trial" in a conspiracy case involving nineteen co-defendants). We cannot say the second factor weighs heavily against the government. Thus, Woodley must establish actual prejudice under Barker.

The Supreme Court in Barker emphasized that prejudice should be assessed in light of three interests: the need "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." 407 U.S. at 532, 92 S. Ct. at 2193. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. The defendant must proffer more than "conclusory assertions of prejudice" or "unsubstantiated allegations of witnesses' faded memories." United States v. Hayes, 40 F.3d 362, 366 (11th Cir. 1994).

19

Woodley concedes that he has no evidence demonstrating the delay impaired his defense. Instead, Woodley offers other reasons that he asserts equal actual prejudice, but they do not. For example, Woodley points to his counsel's request for a mental competency examination as evidence of the "stress and anxiety of incarceration and trial." The timing of the request, however, belies his claim. Woodley was incarcerated on March 30, 2009, and was appointed counsel on April 8, 2009. Only 21 days later, Woodley's counsel filed a motion for a mental evaluation of Woodley. The timing of the request thus cannot be blamed on after-the-fact delays related to pre-trial motions and the fugitive co-defendant Valdivia, particularly when the trial date had not even been set in 2009. And Woodley's conclusory assertions of unsanitary prison conditions and inability to access a law library, without more, are insufficient to establish actual prejudice. See Hayes, 40 F.3d at 366. On the record and asserted reasons before us, we conclude that Woodley did not suffer actual prejudice from the delay in this case.

## IV.  PRIOR BAD ACT EVIDENCE

Woodley next contends that the district court violated Federal Rule of Evidence 404(b) by allowing Petty to testify that Woodley committed a robbery. Because Woodley did not object to this testimony at trial, we review only for plain error. See Davila, 664 F.3d at 1358.

Under Rule 404(b), extrinsic evidence of other crimes, wrongs, or acts is not admissible to prove the character of the defendant to show action in conformity therewith. Such evidence, however, is admissible if it is relevant to issues other than the defendant's character. United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007). If it is, the evidence also must be sufficient to support a finding that the defendant actually committed the extrinsic act, and the probative value of the evidence must not be substantially outweighed by unfair prejudice. Id. Further, evidence is not "extrinsic" under Rule 404(b) "when it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." Id.

The evidence about the alleged robbery was arguably extrinsic to the charged offenses against Woodley. While it was somewhat related to the story of the conspiracy, it was not necessary to the jury's understanding of that story to know the exact details of why Petty ceased selling to Woodley, especially where the details concerned a purported robbery, and a less incendiary explanation would have sufficed. There is also no assertion that the evidence was relevant to an issue other than Woodley's character.

21

Nonetheless, even if the district court erred in admitting Petty's testimony about the alleged robbery, the error did not affect Woodley's substantial rights. See United States v. Rodriguez, 398 F.3d 1291, 1299 (11th Cir. 2005) (stating that to "affect[] substantial rights," the error "almost always . . . must have affected the outcome of the district court proceedings") (internal quotation marks omitted)). Although Woodley bears the burden of showing prejudice under this third prong, he offers no evidence or even argument that the testimony affected the jury verdict. In light of the trial record, we see no evidence of prejudice, either. The district court issued a curative instruction to the jury, advising them not to consider evidence of Woodley's other acts in determining whether he had committed the charged offenses on trial. See United States v. Almanzar, 634 F.3d 1214, 1223 (11th Cir. 2011) (presuming that the jury complied with a district court's curative instruction). On cross-examination of Keith Futch, Woodley himself brought up the robbery, eliciting the clarification that Futch had not been robbed by Woodley, but by someone Woodley knew. Further, the testimony and recordings introduced at trial amply supported the jury's guilty verdict. Accordingly, the district court's admission of the robbery allegation did not affect Woodley's substantial rights.

## V. SUFFICIENCY OF THE EVIDENCE

22

Woodley contends the evidence presented at trial was insufficient to support his convictions. This Court reviews de novo the sufficiency of the evidence, viewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility issues in favor of the guilty verdict. United States v. US Infrastructure, Inc., 576 F.3d 1195, 1203 (11th Cir. 2009). This Court will overturn a conviction only if "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation marks omitted).

To sustain the conspiracy conviction, the government must prove beyond a reasonable doubt an agreement to commit the controlled-substance offense between Woodley and at least one other person, Woodley's knowledge of the general purpose of that agreement, and Woodley's knowing and voluntary participation in the agreement. 21 U.S.C. §§ 841(a), (b) and 846; United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006). The essence of a conspiracy is the agreement itself, not the commission of the substantive offense. United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999).

Woodley challenges his conspiracy conviction on the basis that the jury discredited Petty's entire testimony because it convicted Woodley of a conspiracy involving less than 500 grams of cocaine, when Petty testified that he sold

23

Woodley a much larger amount. This argument is specious. "Overall, the jury gets to make any credibility choices, and this Court will assume that they made them all in the way that supports the verdict." United States v. Garcia-Bercovich, 582 F.3d 1234, 1238 (11th Cir. 2009) (internal quotation marks and alterations omitted). Although the jury apparently did not credit one aspect of Petty's testimony, the rest of Petty's testimony is fully consistent with the verdict.

Turning next to Woodley's convictions for unlawful use of a telephone in Counts 44 and 66, to sustain the convictions, the government must prove beyond a reasonable doubt that Woodley knowingly or intentionally used a telephone to facilitate the commission of a narcotics offense. 21 U.S.C. § 843(b); see id. §§ 841(a), 846. "To prove facilitation, the government must establish that the telephone communication made the narcotics offense easier or less difficult and, thereby, assisted or aided the crime." United States v. Mertilus, 111 F.3d 870, 872 (11th Cir. 1997). A communication that merely checks on the status of sales or the location of the money does not facilitate the offense. See United States v. Rivera, 775 F.2d 1559, 1562-63 (11th Cir. 1985).

Woodley argues that Count 44 fails because he never paid the money referenced in the call to Petty. The underlying inchoate crime of conspiracy, however, is complete upon agreement; it does not require consummation of the

transaction the participants conspired to commit.  The telephone conversation that formed the basis of Count 44 facilitated the broader conspiracy because it furthered an agreement between Woodley and Petty to buy and sell cocaine: Woodley told Petty he had $7,000 dollars to give him and Petty replied he would contact Woodley when he was able to obtain the drugs.  Thus, the fact that the particular transaction discussed never came to full fruition is immaterial to this conviction.

According to Woodley, Count 66 fails because the conversation was merely an attempt to find out the "gossip" on Thompson.  But the conversation was more than a scuttlebutt.  The details of Thompson's arrest were relevant to the conspiracy because she was carrying $87,000 of Petty's money, and Woodley knew that the loss of the money affected Petty's ability to buy cocaine.  Further, Woodley and Petty arranged a meeting over the phone in that call.  Petty testified that at this meeting, the men discussed the seizure of the money and Petty's ability to sell Woodley more cocaine.  On the whole, the conversation furthered the conspiracy by helping Woodley proceed to the next step in the cocaine transaction following Thompson's failed trip to Atlanta.  See Rivera, 775 F.2d at 1562-63.

## VI.  SUBSTANTIVE REASONABLENESS OF SENTENCE

Woodley challenges the substantive reasonableness of his 210-month total

sentence. His challenge rests on the disparity between his sentence and that of allegedly similarly situated conspirators. We review the reasonableness of a sentence under a deferential abuse of discretion standard. Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).

This Court reviews the substantive reasonableness of a sentence under the totality of the circumstances, determining whether the sentence achieves the sentencing goals set forth in 18 U.S.C. § 3553(a). United States v. Pugh, 515 F.3d 1179, 1191-93 (11th Cir. 2008). The district court has discretion to weigh the § 3553(a) factors, and need not weigh the factors equally. United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009). In general, this Court expects a sentence within the guidelines range to be reasonable. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

Here, the district court imposed a substantively reasonable sentence. Woodley argues his sentence exceeded that of more culpable conspirators, but this ignores the facts that he was the only conspirator who went to trial and who did not accept responsibility for his crimes. United States v. Langston, 590 F.3d 1226, 1237 (11th Cir. 2009) (stating that no disparity exists when the co-defendant accepts responsibility and the defendant proceeds to trial). Moreover, Woodley had an extensive prior criminal record that qualified him as a career offender.

26

Woodley has not shown that his total sentence of 210 months, which is the bottom of his advisory guideline range, was substantively unreasonable.

For all these reasons, we affirm.

**AFFIRMED.**